GEORGE MARK et al., Respondents, v. THE VILLAGE OF WEST
TROY, Appellant.

1. HIGHWAY LEADING TO NAVIGABLE WATERS — EXTENSION OF LAND.
The general rule of law, that a public street leading to navigable waters
will keep even pace with the extension of the land, whether the change
in the land be due to natural causes, or to the voluntary act of the owner
of the land, applies to all cases of a public right acquired by dedication,
where there is nothing in the facts and circumstances connected with the
dedication to show that a restriction was intended and imposed, which
would preclude the public from claiming a right of access to the water
over the highway.

2. STREET TERMINATED BY FERRY — EXCLUSION OF PUBLIC FROM
DIRECT ACCESS TO RIVER. It is the reasonable inference, from the facts
and circumstances connected with the dedication, by the original pro-
prietors of the tract, of Canal street, in the village of West Troy,
described in certain contemporaneous instruments as extending " to the
waters of the Hudson river," that the donors, who also owned the
adjacent land under water and reserved the right to operate a ferry, then
in existence, at the foot of the street, intended that the ferry should con-
stitute *pro tanto* a barrier to the public, and that the street should end at
the ferry grounds and not furnish direct access to the navigable waters of
the river. Hence, the village is precluded, especially after many years'
tacit acquiescence in the private ownership thereof, from now undertak-
ing to exercise authority over an extension of the ferry grounds, redeemed
from the river by the owner of the ferry, on the claim that it belongs to
the street.

*Mark* v. *Village of West Troy*, 76 Hun, 162, affirmed.

(Argued December 3, 1896; decided January 19, 1897.)

APPEAL from a judgment of the General Term of the
Supreme Court in the third judicial department, entered
March 2, 1894, which affirmed a judgment in favor of plain-
tiffs entered upon a decision of the court on trial at Special
Term.

In 1808 Elizabeth Bleecker was the owner of a farm of
land where now the village of West Troy stands. Its easterly
boundary was the Hudson river. She was also the owner,
through a grant from the state, of some of the adjoining land
under water. In 1823, she and her husband conveyed to
George Tibbits and others the farm with adjoining land under

water, upon trust, to hold the same in certain proportionate
interests for some seventeen persons and to such uses as the
beneficiaries should from time to time declare.    In 1826, by
grant from the state, the trustees in .the Bleecker deed were
invested with the title to certain additional lands under water
in the Hudson river adjoining the farm, beyond what had
been acquired by Mrs. Bleecker.    In 1829 a partition deed, in
nine parts, was executed between the trustees and their *cestuis
que trustent*, which recited the execution, in 1823, of a deed
by the latter to the former ; by the terms of which the trustees
were empowered, in their discretion, to lay out the premises
into village lots and to sell and convey the same, or any part
thereof.    There was also the recital of the fact that the trus-
tees had caused a certain part of the farm to be laid out into a
village plat, under the name of West Troy; in accordance
with a map made by one Roberts, dated March 7th, 1828, and
filed in the Albany county clerk's office, with the field book
accompanying the same.    It appears, and it is so found, that
the trustees, in mapping out the proposed village, had granted
and dedicated to the public and to the defendant certain por-
tions thereof for streets and highways.    The parties to the
partition deed just mentioned partitioned among themselves
the village lots according to their respective rights and shares ;
the conveyance of lots bordering upon the river including the
land under water lying in front of the same.    The grants of
lots were made subject to the agreements and reservations
expressed in the partition deed and there were especially
reserved all rights of ferrying, or of establishing ferries
across the river to the trustees ; which, it was agreed, should
remain vested in them until further partition was made by
the proprietors of the residue of the trust estate.    By this
partition deed and by the map and field book of Roberts, the
surveyor, certain streets are laid out and described, and, among
them, Canal street, now called 16th street, was described
as extending across the Erie canal eastwardly " to the river,"
or " to the waters of the Hudson River," or " to the water's
edge."    Broad street, now called Broadway, extended from

Canal street southwardly and at that point was the most easterly street laid down on the Roberts map. The description of the lots on the east side of Broad street extends to the land under water opposite them. There was excepted from the conveyance in the partition deed a certain lot at the southeast corner of the intersection of Broad street with Canal street. At the time of the partition there was, and had long been, a ferry in operation across the river to Troy, with a landing at the point where Canal street would terminate, and the lot at the corner of Canal and Broad streets, being No. 40 upon the map, was retained by the trustees and reserved for the purpose of maintaining the ferry. In 1835 and 1836, Cushman and Wiswall became the owners, by conveyance from the trustees, of lot No. 40 and also of all the exclusive right and privilege of keeping and maintaining a ferry and ferries from every part of the village of West Troy, "and the right and privilege of approach to said ferries, as now used and vested in the said trustees." Wiswall at the time was owner of lot 39 and was operating the old ferry and he and Cushman had thus become the owners, not only of so much of the land under water as extended eastwardly from their lots into the river, but also of the ferry then being operated and the property belonging to said ferry and of all the particular and general ferry rights and property which had been possessed by the trustees. Cushman and Wiswall, and their successors, gradually filled in the river in front of the foot of Canal street and in front of lot No. 40, until a strip of land of some 200 feet in length was reclaimed, eastwardly from the former foot of Canal street to where the present ferry landing is. The ownership of the ferry landing and lands pertaining to it, changed from time to time; but the ferry was always maintained and all its rights, franchises and property, which had vested in Cushman and Wiswall, became vested in the plaintiffs, who are the present owners thereof. From 1865, when the gate from the toll house was built across the ferry grounds, all the land redeemed from the river, extending from the former foot of Canal street, has

been inclosed and, in connection with an additional strip of land purchased by Wiswall immediately north of the ferry property, has been used for ferry approaches and purposes. No part of this land at the foot of Canal (or 16th) street, and which the toll gate shuts off at a point near the former foot of the street, has ever been laid out upon, or worked, by the public authorities as a street; nor has the public ever used it as a public highway, nor otherwise than as a passage, through an arch and through gates, to reach the ferryboats. There was never any formal acceptance by the defendant of the dedication of Canal street upon the map and, as to that dedication, the user has been confined to the street as it terminated formerly. There had been no interference with plaintiffs on the part of the defendant, until in 1888; when, pursuant to a resolution of the defendant's board of trustees, the street commissioner removed and destroyed the fence, which the plaintiffs had maintained for the purpose of inclosing the ferry landing and property. They rebuilt it and then defendant's board of trustees adopted another resolution, directing the street commissioner to remove, forthwith, the fences, buildings and other obstructions maintained by the plaintiffs at the foot of 16th street, (the former Canal street), in the event of the plaintiffs failing to remove the same upon notice. Thereupon, plaintiffs brought this action to restrain the defendant and its officers from putting the threat into execution.

The trial judge found that, in mapping out the Bleecker farm into village lots and streets, the then owners thereof "did not intend to dedicate to the public said Canal street, now known as 16th street, any further east than as indicated on said map; nor did they intend by such dedication as was made to interfere with or encroach upon the public ferry then existing and which, at that time, had its landing within the said lines of said street produced easterly." He also found, that it was the intent of the farm owners, in mapping out and partitioning the lots among themselves, to "except out of such dedication the then existing ferry and the exclusive right of occupying and maintaining a ferry or ferries."

The dispute between the plaintiffs and defendant is whether there was such a dedication of Canal street as a highway, as would carry or extend that street over the newly-made land to the river's edge. The Special Term awarded to the plaintiffs equitable relief by way of an injunction against the defendant, and the General Term have affirmed that determination; the theory of the decision of the latter court, as gathered from the opinion, being that there was no intention on the part of the farm owners to include, as a part of Canal street the shore, so far as the same was required for ferry use; or, if the dedication of the street was not so limited, then that there had been, in effect, a revocation or modification of the dedication as the effect of their deed in 1835 to Cushman and Wiswall.

*E. Countryman* for appellant. The acts of making the survey and map of the village plat, including the streets, as designated and named, filing the map in the county clerk's office, conveying the lots with reference to the streets and throwing the streets open for public use and travel, were sufficient to constitute an irrevocable dedication of the lands as public streets and highways. (*City of Cohoes* v. *D. & H. C. Co.*, 134 N. Y. 397; *Flack* v. *Vil. of Green Island,* 122 N. Y. 107, 108; *Cox* v. *James,* 45 N. Y. 557; *Wiggins* v. *McCleary,* 49 N. Y. 346; *De Witt* v. *Vil. of Ithaca,* 15 Hun, 568; *People ex rel.* v. *City of Brooklyn,* 48 Barb. 211; *Trustees of W.* v. *Cowen,* 4 Paige, 510; *Livingston* v. *Mayor, etc.,* 8 Wend. 85, 104–106; *Wyman* v. *Mayor, etc.,* 11 Wend. 487, 500; *Clements* v. *Vil. of West Troy,* 10 How. Pr. 199, 205, 206; *Taylor* v. *Hepper,* 5 T. & C. 173; 62 N. Y. 649, 650; *Bissell* v. *N. Y. C. R. R. Co.,* 23 N. Y. 62.) The plaintiffs cannot plead their own wrongful acts in obstructing the street as a bar to the rights of the village, or hold the village accountable for them. They cannot obstruct the street and then charge the public with the loss of the street by nonuser, occasioned solely by such wrongful acts. (*Amsbey*

58

v. *Hinds*, 46 Barb. 622, 624; *Hood* v. *Smith*, 5 Wkly. Dig. 117; *Bridges* v. *Wyckoff*, 67 N. Y. 130; *People* v. *Mayor, etc.,* 32 Barb. 102; *In re R. R. Co.*, 123 N. Y. 351; *Schaper* v. *B. & L. I. C. R. Co.*, 124 N. Y. 630; *Lorimer R. Co. Case*, 137 Penn. St. 533; *Mayor, etc.,* v. *Starin*, 106 N. Y. 2; *Driggs* v. *Phillips*, 103 N. Y. 77; *St. Vincent F. O. Asylum* v. *City of Troy*, 76 N. Y. 108; *People* v. *Fowler*, 43 N. Y. S. R. 415; *People ex rel.* v. *Maher*, 141 N. Y. 330.) The reservations in the deeds from the original grantors of the exclusive right of ferriage across the river does not affect the question before the court. (*Power* v. *Vil. of Athens*, 99 N. Y. 592; *C. B. Co.* v. *Paige*, 83 N. Y. 178; *Benson* v. *Mayor, etc.,* 10 Barb. 223; 2 Washb. on Real Prop. [4th ed.] 292, 293.) The *locus in quo* was within the jurisdiction of the village authorities of West Troy, and they were acting within their authority and the line of their duty in removing the obstructions from the street. (L. 1850, ch. 230, §§ 1, 20; L. 1879, ch. 52, §§ 5, 24.)

*R. A. Parmenter* for respondents. The plaintiffs may rightfully stand upon the quiet, peaceable and continuous possession of their property, under claim of title in themselves and through their grantors, for a period of more than sixty years next before the commencement of the action. And the defendant will not be allowed, by way of defense, to assert hostile title to the *locus in quo* on the theory that the same is a public street within said village of West Troy when, as the proofs show, the alleged obstruction had existed and been maintained for a period of time almost beyond the memory of men now living. (L. 1878, ch. 245, § 1; *Rozell* v. *Andrews*, 103 N. Y. 150.) The ferry rights and franchises reserved and granted to the plaintiffs and their grantors in the deeds and releases produced in evidence are property, and as such are, under the statutes of this state, transferable and descendible as property. They rank as estates among incorporeal hereditaments, and are founded on grant or prescription. (*Benson* v. *Mayor, etc.*, 10 Barb. 223; 2 Willard on

Real Estate, 45, § 7; 2 R. S. 1159, § 8; 1 R. S. 526, § 8; *C. B. Co.* v. *Paige*, 83 N. Y. 188; *People* v. *Mayor, etc.*, 32 Barb. 115.) A conveyance of land with apt words to define the grant and nature of the estate will be interpreted according to the language employed; but in a dedication of land to the public use the intent of the donor will determine the character, purpose and limitation of the donation. And such intent must be established by acts unequivocal and decisive in their character and unmistakable in their purpose. (*Grinnell* v. *Kirkland*, 2 Abb. [N. C.] 386; 68 N. Y. 629; *Badeau* v. *Mead*, 14 Barb. 328; *N. F. S. B. Co.* v. *Buchman*, 66 N. Y. 261; *Rummel* v. *N. Y., L. & W. R. R. Co.*, 30 N. Y. S. R. 236; *State* v. *Green*, 41 Iowa, 693; *Buchanan* v. *Curtis*, 25 Wis. 99; *White* v. *Bradley*, 66 Me. 254; *Flack* v. *Vil. of Green Island*, 122 N. Y. 107; *Hinks* v. *Hinks*, 46 Me. 423; *City of Cohoes* v. *D. & H. C. Co.*, 54 Hun, 562; *City of Cohoes* v. *Morrison*, 42 Hun, 216.) The acceptance of a highway by dedication to be effectual over its entire line must be accepted as a whole and opened, worked and used by the public the entire length. Here there is no proof of acceptance at all, and the user by the public of Canal street has never been extended to the plaintiff's premises described in the complaint, nor has it been opened, worked or used by the public easterly beyond the western line of the plaintiffs' premises. (*Beckwith* v. *Whalen*, 70 N. Y. 431.) In any reasonable view to be taken of the dedication of Canal street and the user of the same, that street, easterly from its terminus on the Roberts map, has, for a long term of years, ceased to be a road for any purpose whatever. (*Beckwith* v. *Whalen*, 70 N. Y. 431; *People ex rel.* v. *Kelsey*, 38 Barb. 269; *People* v. *N. Y. & S. I. F. Co.*, 68 N. Y. 71; *Vil. of Brooklyn* v. *Smith*, 44 Am. Rep. 90; *P. S. E. Co.* v. *P., etc., S. Co.*, 34 Am. Rep. 652.)

GRAY, J. In determining the scope and purpose of the dedication of Canal street, as a public street, we may refer to the acts and declarations of the donors and to those surround-

ing circumstances, which throw light upon the subject and, in that way, discover the intention. (*Morgan* v. *R. R. Co.*, 96 U. S. 723.) If we can gather the intention that that street should not extend eastwardly beyond its easterly terminus, as laid down on the Roberts map, then it must control. Undoubtedly, it is the general rule of law, that a public street leading to navigable waters would keep even pace with the extension of the land, so as to preserve an unbroken union between the easement on land and that on such navigable waters; whether the change in the land be due to natural causes, or to the voluntary act of the owner of the land. (*People* v. *Lambier*, 5 Denio, 9.) That general rule applies to all cases of a public right acquired by dedication, where there is nothing in the facts and circumstances connected with the dedication to show that a restriction was intended and imposed, which would preclude the public from claiming a right of access to the river over the highway. It is usually the case that the gift to the public of a street ending at the shore of a navigable river is for the purpose of providing the means of access to the waters of the river; but the present case is one where, as it seems to me, such an intention did not exist, when the village of West Troy was planned and mapped out by the proprietors of the land, and where, indeed, it seems to be distinctly negatived by their acts. When the Bleecker farm was mapped into streets and lots to constitute the future village of West Troy, the proprietors, in causing the partition between themselves of the lots, expressly reserved to, and vested in their trustees, who held the legal title, an exclusive right of ferriage between their shore and the opposite city of Troy. The ferry then existed and was at the foot of Canal street, as laid down upon the map, and in the partitioning of the village lots the trustees retained the ferry property and reserved the adjoining lot for the very purpose of maintaining the ferry. Thus, it was in contemplation at the time, that the ferry, which had for years been operated at that particular point, should remain and be operated as such by the trustees and should constitute *pro tanto* a barrier to the

public access to the waters of the river. It is to be observed that the trustees held the title to the adjoining lands under the waters of the Hudson river by grant from the state and in every case of a conveyance, in the partitioning of the property, of lots bordering upon the shore of the river, the grant included the land under water in front of the lots. At the time of the completion of the partition of the property as mapped out, the trustees remained the proprietors of the land under water in the river in front of the foot of Canal street, as well as of the next adjoinining lot which they had reserved to be used in connection with their ferry. I think that upon reflection the reservation and agreements in the partition deed will seem to demonstrate that the scope of the dedication of Canal street, as a street, was to provide a means of access to the ferry, which was to be maintained at its foot, and not to make of it a public highway reaching to the navigable waters of the river. The intention was to preserve the ferry that was there and to deprive every beneficiary, in this scheme for the creation of a municipality, of any right of ferriage, or of ferry landings, and to compel them to use the established ferry. The public could enjoy the street for the purpose apparently intended of reaching the established ferry and the design of the street for that purpose is the more reasonable inference. The features in this case of the ferry at the foot of the street and of the reservation to the trustees of the exclusive right to operate it, differentiate it from the other cases to which our attention has been called by the appellant. In the *Lambier* case (*supra*), after Warren street had been laid out and opened from Court street in Brooklyn to the East river, an act of the legislature, passed in 1836, authorized the several persons therein named to construct wharves, bulkheads, piers, etc., in the East river in front of their lands in the city of Brooklyn. One of the persons named in the act, and who owned the piece of land through which Warren street passed, erected a bulkhead in the river in front of his land, including that covered by the street, and filled up the intervening space with earth, so as to transfer the

shore of the river to the bulkhead. It was held that the
design of the act of 1836 was to confer privileges on the own-
ers of the land adjoining the East river, but not to destroy
the right of the public to reach its waters through Warren, or
any other, street, which then led to its shore. It was observed
in the opinion, that while the act authorized piers and bulk-
heads to be erected and the bed of the river to be filled up in
front of the lands of the persons named, that that could
hardly be understood to include land over which a perpetual
right of way existed in favor of the public, although the fee
might be in such owners. That case differs, therefore, in essen-
tial facts, as the several cases to which we are referred in the
New Jersey courts differ, from the case at bar; where it can-
not fairly be inferred from the acts and declarations of the
proprietors of the Bleecker farm that Canal street should
afford to the public a means of direct access to the navigable
waters of the Hudson river. The intention that Canal street
at its easterly point should terminate at the ferry grounds is
further made manifest by the subsequent conveyance by the
trustees, in 1835 and 1836, to Cushman and Wiswall of exclu-
sive ferry rights and privileges, " and the right and privilege
of approach to said ferry as now used and vested in the said
trustees," together with the lot adjoining the foot of Canal
street on the south, which the trustees had retained for use in
connection with the ferry. As an act on the part of those
who held the legal title and acted as trustees for the land pro-
prietors, it very clearly indicated their understanding that the
public had acquired no rights in Canal street, as a highway,
beyond where the ferry rights commenced. I think we
may assume, too, that such has been the understand-
ing of the defendant, for whose benefit the dedication
was made. Since the time when Cushman and Wiswall
and their successors reclaimed the land under water in
front of the foot of Canal street and made it useful and valu-
able for their ferry purposes and inclosed it, as far back as
1865, no attempt has been made by the defendant to interfere
with the ferry properties, or to exercise any authority over the

reclaimed land, until the proceedings which resulted in the present action. This acquiescence through such a long period of time is a very significant circumstance. It seems to me that the finding of the trial court, that the owners of the Bleecker farm did not intend to dedicate to the public Canal street any further east than is indicated on the Roberts map and that they did not intend to interfere with, or encroach upon, the existing ferry, is supported by every reasonable inference which can be drawn from their acts and declarations.

I advise, therefore, that the judgment appealed from should be affirmed.

All concur, except Andrews, Ch. J., not voting, and Bartlett, J., dissenting.

Judgment affirmed.