NICHOLS COPPER COMPANY, Appellant, *v.* MAURICE E. CONNOLLY, as President of the Borough of Queens, and Another, Respondents.

Second Department, March 14, 1924.

Municipal corporations — action to restrain city from trespassing on certain land and removing structures — land is claimed by city to be streets — plaintiff has constructed railroad switches and tracks thereon — earlier deeds referred to land as streets — public has used land as streets to some extent — city never acquired land for streets nor kept it in repair — city has no title by prescription — offer of dedication does not arise from filing sales maps — acceptance of offer not implied from user in absence of action by public authorities in keeping streets in repair — formal acceptance not shown by city filing maps, since offer was revoked before that time — death of owner revoked offer to dedicate.

In an action to restrain the city of New York from trespassing on certain land and from removing railroad tracks and switches and other structures thereon, it appears that the city claims to have acquired the land to be used for public streets; that in the earlier deeds of the property in question reference is made to so-called streets at the location in question and the deeds stipulated that the same should remain open and unobstructed; that on certain sales maps filed by owners the streets were designated; that the alleged streets were used to a certain extent by the general public; that the alleged offer to dedicate the land for street purposes was revoked by the owner of the land; and that the city of New York never took any legal steps to acquire the land for a street, nor has it ever repaired or maintained the land for that purpose.

*Held*, that the city of New York did not acquire the land in question for street purposes by prescription, since it appears that although the alleged streets were used to some extent by the public, the city never repaired, maintained or in any way kept up the streets as public highways.

An offer to dedicate the land for street purposes did not arise by the filing of certain sales maps on which the alleged streets were designated, nor did the filing of the maps plus the conveyances of land bounded on the proposed streets constitute an offer to dedicate public easements over the streets.

Furthermore, an implied acceptance of the alleged offer to dedicate was not shown by the mere user by the public. In order to constitute such an implied acceptance, it was necessary to show action by the public authorities in maintaining and repairing the streets as a highway.

The city cannot show a formal acceptance of the alleged offer to dedicate by proof of the filing of certain maps by the city in 1907 and later, since it clearly appears that if there was a valid offer to dedicate the land, that offer was withdrawn before the city filed the first map.

Furthermore, the owner of the land who made the alleged offer to dedicate died in 1900, and the result of his death was to revoke the offer to dedicate the land for streets.

KELLY, P. J., and KAPPER, J., dissent, with opinion.

APPEAL by the plaintiff, Nichols Copper Company, from a judgment of the Supreme Court in favor of the defendants, entered in the

office of the clerk of the county of Queens on the 1st day of July, 1921, upon the decision of the court, rendered after a trial at the Queens Special Term, dismissing the complaint upon the merits.

*Nathan L. Miller* [*Harley L. Stowell* and *Arthur W. Mattson* with him on the brief], for the appellant.

*Elliott S. Benedict* [*George P. Nicholson*, Corporation Counsel, *John F. O'Brien*, *Robert J. Culhane* and *Joel J. Squier* with him on the brief], for the respondents.

KELBY, J.:

The action is for an injunction restraining the city of New York and defendant Connolly, as president of the borough of Queens, their servants and agents, from trespassing upon lands claimed to be owned by the plaintiff, and from removing or interfering with buildings or other property on said premises.

The plaintiff is now, and has been for many years past, conducting the business of refining copper upon the said premises, using and operating a narrow gauge railway for interplant communication, and also operating railroad sidings and connections with the Long Island railroad, which is immediately north of the plaintiff's property. The specific property which is the subject of this action is described on certain maps and deeds as South avenue (also called Creek street) and River avenue.

The defendants claimed in their answer that. " Creek Street forming a strip of land 60 feet in width and running along the southerly line and adjacent to the Long Island Railroad as well as River Avenue forming a strip of land 60 feet wide running along the easterly portion of the land alleged to be owned by plaintiff, are public streets of the City of New York and that easements for street purposes exist thereon  *  *  *."

The plaintiff conducts, on five blocks of land in what was formerly known as the village of Laurel Hill in the town of Newtown, county of Queens, a large manufacturing plant for the refining of copper. The total value of the refinery is about $6,000,000, and there are employed therein from 1,800 to 1,900 men at maximum capacity, and at the time of the commencement of this action, when operating at reduced capacity, there were employed from 1,000 to 1,100 men. There were produced normally about 45,000,000 pounds of refined copper a month. Creek street, so called, is said to parallel the right of way of the Long Island railroad, and the defendants claim that Creek street is situated immediately. north of the plaintiff's property. The plaintiff claims title to this property, and the evidence shows that since plaintiff purchased the same it has been used for private purposes in the storage of wood, poles

and other material in large quantities, and that it has also been devoted to uses which are incident to the receipt and shipment of raw materials and finished products. Since 1918 there have been located on the so-called Creek street a loading shed and two railroad sidings connected with the Long Island railroad, over which an average of 150 cars per week operate. In addition to these sidings there are certain narrow gauge industrial tracks running from the southerly end of the plant, where the refining process originates, and ending in between the railroad sidings and Creek street. There is no other place on plaintiff's property for the sidings and railroad connections, and it is claimed that the plaintiff could not do business without them, the necessity for the railroad connection being that plaintiff refines smelted copper ore, seventy-five per cent of which comes by rail and takes what is known as a "milling in transit" rate; that is, it receives a through railroad rate from a producing point to a consuming point, allowing the copper to stop in transit to be refined, and for this a lesser rate is given than the total of the individual rates from the same shipping point to the refinery and from the refinery to the consuming point. It further appears that plaintiff has contracts based on the "milling in transit" rate, which could not be carried out without the railroad sidings on Creek street.

The immediate cause of the commencement of this action was the threat of the borough president of Queens to tear up and remove railroad sidings, industrial tracks and structures which were alleged by the defendants to be on River avenue and on Creek street or South avenue.

It is conceded that the city of New York has never taken proceedings to acquire the fee for street purposes on Creek street or River avenue, or to acquire any other interest in these alleged streets. It also affirmatively appears from the record that the city has never repaired, maintained or in any way kept up either Creek street or River avenue as public highways.

The learned trial justice found that the streets known as Creek street (South avenue) and Brook avenue (River avenue) "as laid out on the Schieffelin Map, has been continuously used by the public for vehicular and pedestrian traffic and kept open by the City of New York and its predecessors as a highway for 20 years next preceding the year 1918."

The plaintiff claims title to Creek street, so called, and to River avenue, so called, through various deeds. The first deed is a deed from Waters to Van Mater, recorded September 17, 1853. It conveys a farm of ninety-six acres, the southerly boundary of which was the high-water mark of Newtown creek. Van Mater,

the purchaser, gave back to Waters, the seller, a purchase-money mortgage as part of the purchase price. Thereafter that purchase-money mortgage was foreclosed on or about June 11, 1863. Neither the deed nor the purchase-money mortgage, in the description of the property affected by either instrument, contains any reference whatever to streets or avenues as lying within the tract; nor is any map referred to for the description of the property. The boundaries are by adjacent owners, the highway at the north and the creek at the south. On October 26, 1863, Jacob P. Carll, sheriff of Queens county, conveyed part of the mortgaged premises to Alfred Dickinson by deed. The deed to Dickinson conveyed " All those certain lots * * * of land situate * * * in the Village of Laurel Hill Township of Newtown County of Queens and State of New York and laid down and designated on a certain Map entitled Map of part of The Village of Laurel Hill * * * filed in the office of the Clerk of the County of Queens Oct. 15, 1863." That deed in foreclosure conveyed several parcels of land north of the Long Island railroad, and blocks Nos. 4 and 5 to the south of the railroad, the latter two parcels being part of the premises now owned by the plaintiff. The map, hereinafter referred to as the 1863 map, shows a so-called River avenue, fifty feet in width, located in the easterly part of the premises owned by the plaintiff. This location of River avenue, however, varies by ten feet to the westward from the River avenue now claimed by the city to exist, and is the same River avenue as located on a later map, called the Schieffelin map, and the city maps, which will be alluded to later. This map shows no Creek street or South avenue located to the north of the plaintiff's property. The various lots to the south of the Long Island railroad are depicted as abutting immediately on the railroad; in other words, there is no intervening street depicted between the railroad and the northerly boundary of the plaintiff's property. An inspection of this map shows an unnamed paper street running from Hamilton avenue, which street is not shown on any subsequent map.

Prior to the filing of the 1863 map, and in 1858, another map was filed. It also fails to show any Creek street or South avenue between the northerly boundary of the plaintiff's premises and the Long Island railroad. It does show a fifty-foot wide street, called River avenue, running from Newtown creek northerly to Clinton place, which is one block north of the railroad track. Neither the map of 1858 nor the map of 1863 shows for what purpose or by whose direction either of said maps was filed. Neither of them is drawn to scale, nor is there any legend on them showing a scale. Each of them is described by the surveyors for the

plaintiff and the defendants as being inaccurate and inexact. There is nothing sufficiently definite depicted on them to determine locations.

Dickinson, by a deed dated March, 1865, conveyed blocks 4 and 5 to Samuel B. Schieffelin. It conveys, by reference to the map of 1863, blocks 4 and 5, bounded on the east by the center line of Hamilton avenue, on the north by the Flushing railroad, on the west by the center line of Washington avenue, and on the south by Newtown creek.

In August, 1886, Samuel B. Schieffelin had a survey made and a map prepared of the property owned by him at Laurel Hill. The map, however, was not filed in the office of the clerk of the county of Queens until March 12, 1892. It shows, running from west to east — from Washington avenue to the easterly boundary of the Schieffelin property a space, sixty feet in width, designated as South avenue, immediately to the south of the right of way of the Long Island railroad. That paper street or avenue is claimed by the city to be what is known as Creek street. There is no pretense, however, that it ever extended to the west of Washington avenue or to the east of the easterly boundary of the plaintiff's land. River avenue, the other street in question in this action, is shown on the said map but not in exactly the same position as it is shown on the maps of 1858 and 1863.

In August, 1890, Schieffelin conveyed to G. H. Nichols & Co. block 4 on the Schieffelin map. On the 1863 map the property is also described as block 4, bounded on the east by the center line of Clay avenue, on the north by the Flushing railroad (now known as the Long Island railroad), on the west by the center line of Washington avenue, and on the south by Newtown creek. This deed contains the following: "It being understood that Washington Avenue and Clay Avenue are to remain open *and that sixty feet of the Northerly side of said block is to be left open between it and the Long Island Railroad to be used as a Public Highway or Street.*" This is the first provision in any of the documents in evidence that refers to a right of way over any part of Creek street or South avenue. G. H. Nichols & Co. conveyed block 4 to the Nichols Chemical Company in January, 1891. The latter company was the predecessor of the present plaintiff. In June, 1894, the Nichols Chemical Company, the plaintiff's predecessor, acquired title to the northern portion of block 5; the premises conveyed being bounded on the north by the southerly side of South avenue. The conveyance expressly included the title and interest of the grantor, Schieffelin, in and to one-half of South avenue (Creek street). The deed also recited: "it being understood

that the said Avenues [meaning South avenue and others] are to be kept open and unobstructed." The property was designated as lots 1 to 26 inclusive in block 5 on a certain map annexed to a deed from Schieffelin to Frederick Hofener, dated August 31, 1887. The original of this exhibit shows structures within the lines of Clay avenue and also of Hamilton avenue. This is the first mention, in any of the conveyances, of South avenue or Creek street with reference to the Schieffelin map. It is not expressly stated that the streets and avenues are to be kept open and unobstructed as *public highways*, but simply that they are to be kept open and unobstructed.

By deeds dated May, 1898, and September, 1905, the plaintiff completed its title to the portion of block 5 not conveyed by plaintiff's Exhibit 15; that is, the plaintiff purchased from Schieffelin's grantee, Hofener, and another, title to the southerly part of block 5.

By deed dated December 15, 1898, which deed is important in another branch of the case concerning the revocation of an alleged offer to dedicate, Schieffelin, who still owned blocks 6, 7 and 8 to the east of blocks 4 and 5, conveyed to the plaintiff's predecessor, the Nichols Chemical Company, all the right, title and interest of the grantor in and to a strip of land, called South avenue, between Washington avenue and Clifton avenue (including that portion north of blocks 4 and 5). The deed contained the recital that it was understood that the above-mentioned portion of South avenue was to be kept open and unobstructed. There was no express direction that it was to be kept open and unobstructed as a *public highway*.

In September, 1905, therefore, Schieffelin had conveyed to the plaintiff all of blocks 4 and 5 on the 1863 and Schieffelin maps, including the fee to the bed of Creek street or South avenue with the reservation to use the northerly half of South avenue.

In March, 1897, Schieffelin conveyed block 6 to the Nichols Chemical Company by reference to both the 1863 and the Schieffelin maps, bounding the same on the north by the southerly side of South avenue, the easterly side of Hamilton avenue, the westerly side of Fulton avenue and the creek, together with one-half of Fulton, South and Hamilton avenues adjoining the block. The deed has the following recital, " it being understood that the said Fulton and South avenues are to be kept open and unobstructed."

On December 15, 1898, Schieffelin, who still owned blocks 7 and 8, conveyed block 7 to the plaintiff's predecessor by reference to the Schieffelin map, only bounding it by South avenue on the

north. That deed also contains the following: " Parcel Number Two, All the estate right title and interest of the parties of the first part [Schieffelin] in and to that portion of the strip of land called South Avenue on the above mentioned Map lying northwest of the centre line of Clifton Avenue and stretching to the northwesterly side of Washington Avenue and also in and to the easterly half of Fulton Avenue and the westerly half of Clifton Avenue it being understood that Clifton Avenue and the northerly half of the above mentioned portion of South Avenue are to be kept open and unobstructed the reference in the above description to the Schieffelin Map and various avenues appearing thereon *are purely for purposes of description and location and are not intended as any public dedication or a recognition of and confirmation of a public dedication of the said so-called Avenues for street or other public purposes.*"

Schieffelin still owned the remaining blocks 8 and 9. Here it is to be noted, in passing, that the two earlier maps of 1858 and 1863 contain eight block numbers to the south of the Long Island railroad, while the later Schieffelin map contains nine block numbers. The two earlier maps show River avenue as a paper street running north and south between what are shown on the Schieffelin map as blocks 8 and 9. It will be observed that Schieffelin has thus preserved a right of way or access, but not as a public highway, to the northerly half of South avenue — that is thirty feet — so that he may still get to his remaining blocks 8 and 9. There can be no question of the intent of the parties at this time that the streets were not to be considered as public streets.

In December, 1898, an agreement was entered into between Schieffelin and the Nichols Chemical Company, plaintiff's predecessor, agreeing that Fulton avenue, Washington avenue and South avenue northwest of Clifton avenue (except the northerly half) shall be closed, and the parties mutually release and surrender their rights to have them kept open. This agreement declares that any and all dedications of such streets for street purposes are " revoked, annulled and extinguished to the fullest extent that they can legally effect the same." There can be no doubt, therefore, so far as the parties are concerned, of an express intention to revoke completely any dedication of South avenue as a public street.

In February, 1904, the Schieffelin heirs conveyed to the Nichols Chemical Company block 8 by reference to the Schieffelin map, bounding the block by South avenue on the north, River avenue on the east, Clifton avenue on the west, and Newtown creek on the south. The deed also conveyed all the estate, right, title

**43**

and interest of the parties of the first part in and to Newtown creek adjoining the parcel of land described.

In April, 1919, Hofener, who had formerly owned a part of the southerly end of block 5, conveyed block 9 to the Nichols Copper Company. The property is described as being the same premises conveyed to Frederick Hofener by Samuel B. Schieffelin by deed dated January 17, 1900, together with all the right, title and interest of the party of the first part of, in and to " any land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining said premises." The deed to Hofener from Schieffelin, just mentioned, conveyed block 9 with reference to the Schieffelin map, and stated the boundaries as follows: " northerly by South Avenue, easterly by lands now or late of the Tucker and Carter Manufacturing Company, southerly by Newtown Creek, and westerly by River Avenue * * *. Subject as to certain of the streets, and Avenues laid down on said map, to the revocation executed by the said Samuel B. Schieffelin and the Nichols Chemical Company under date of December 15th, 1898." These last two conveyances are the only ones that mentioned River avenue by name. The plaintiff's title to the bed of River avenue is confirmed by a deed executed by the Schieffelin heirs and dated March 28, 1917.

There are only two instruments of conveyance that are not part of the plaintiff's chain of title. These are deeds from Schieffelin to the board of education of union free school district No. 4 of the town of Newtown, dated respectively June 28, 1891, and September 14, 1896. Together they convey lots 24 to 29, inclusive, on the Schieffelin map. Neither deed mentions Creek street or River avenue, nor does any of the property conveyed abut upon either Creek street or River avenue or any extension thereof; nor can Creek street or River avenue be deemed a means of access to the premises conveyed for school purposes; nor can River avenue be called a proper connection with the creek, because on all the maps it ends at Clinton place, and on the later maps of the city, so-called official maps, there is a gore of private property intervening immediately to the north of the railroad tracks.

The foregoing is, I think, a fair *résumé* of the necessary chain of title comprising the documentary evidence.

It might be well, also, to have in mind a physical idea of the premises. There can be no doubt that most of the land in suit was a continuous mud flat. The 1858 map shows a contemplated bulkhead. Later, somebody built this bulkhead. Who did it does not appear. The 1858 map shows what purports to be a water line, running considerably into block 4, and still further

into block 5; then comes back, crossing Hamilton avenue; then proceeds northeasterly again, then southeasterly, and then easterly. It appears that after the bulkhead was built the tide came in around the easterly end of it and spread out over the inclosed mud flat. After the plaintiff had acquired block 4, which is the most westerly of the blocks, it filled the same in with slag from its factory, and then by a similar process it filled in the blocks to the east, and bought them after they were filled in. In the filling-in process it appears that long fingers, which correspond somewhat in location to Clay avenue, Hamilton avenue, Fulton avenue and Clifton avenue, were first filled in. These created long oblong ponds which at high water overflowed, and at Hamilton avenue it was necessary to build a bridge so that access might be had between blocks 5 and 6. Many of the witnesses say that at high tide the water came right up to the Long Island railroad right of way. Certainly the evidence, read as a whole, shows that pedestrians invariably chose the right of way of the railroad as a means of going east and west, rather than resort to any of the so-called paper streets. The railroad right of way was higher in level than the adjacent property to the south and afforded a dry footing.

This is the kind of property that the city claims it is entitled to hold by reason of an acceptance of a dedication. Indeed, the trial justice apparently has held that the city has acquired title by a prescriptive right of twenty years' user as a highway.

If the intention of the trial justice was to hold that the city has acquired a prescriptive right as distinguished from a right acquired by the acceptance of an alleged offer of dedication, I think such holding was error. Whatever may be the rule in other States, the rule is quite clear in the State of New York that in order to establish a prescriptive user, the user must be like that of highways generally. " The road must not only be traveled upon, but it must be kept in repair or taken in charge and adopted by the public authorities." (*Speir* v. *Town of New Utrecht,* 121 N. Y. 420, 429; *Johnson* v. *City of Niagara Falls,* 230 id. 77.) Other decisions to the same effect may be cited in great number.

Easements in public streets may be acquired in the following ways: (1) By condemnation proceedings under a statute. (2) By prescription, or where land is used by the public as a highway for twenty years with the knowledge, but without the consent, of the owner. (3) By dedication through offer and *implied* acceptance, or where the owner throws open his land intending to dedicate it for a highway, and the public use it for such a length of time that they would be seriously inconvenienced by an interruption of the enjoyment. (4) By dedication through offer and actual acceptance, or

where the owner throws open his land and by acts or words invites acceptance of the same for a highway, and the public authorities, formally or in terms, accept it as· a highway. This was the rule laid down in the case of *City of Cohoes* v. *D. & H. C. Co.* (134 N. Y. 397, 402).

A public street easement by prescription is out of the case, as pointed out above, because of the admitted fact that the city has never repaired, maintained, kept up, or in any way assumed control over or responsibility for these streets. There is confusion in the case at bar because of the effort on the part of the city to have us construe a private easement in the streets named on the maps as being equivalent to a public use or a public easement in the streets. The filing of a sales map does not of itself constitute an offer to dedicate to *public·* use the streets shown on the map; nor does the filing of a map plus conveyances of land bounded on proposed streets delineated on such map constitute an offer to dedicate *public* easements over the streets. (*Holdane* v. *Trustees of Village of Cold Spring,* 21 N. Y. 474; *Matter of City of New York* [*Roosevelt Ave.*], 186 App. Div. 457; *Smith* v. *Smith,* 120 id. 278, 281.) The filing of such a map plus conveyances referring to streets shown thereon does operate to give the grantees a *private easement* in the streets. But the law in this State is quite different from that in other States. In this State a grantee of property abutting on a street does not acquire an implied easement on any street other than that on which he abuts, and on that street only to the next intersecting streets. In other words, it is really an easement of access. (*Reis* v. *City of New York,* 188 N. Y. 58; *Matter of City of New York* [*Sedgwick Ave.*], 213 id. 438, 442; *Lord* v. *Atkins,* 138 id. 184, 191.)

The effort made by the city to show an implied acceptance, by user, of an offer to dedicate, is, it seems to me, abortive. I think an examination of the facts clearly shows that even if it were conceded that the *public at large* had used either of these streets for any length of time, it could hardly be said from the occasional limited use shown in the record, that they would be seriously inconvenienced by a present interruption of the alleged enjoyment. The principle of estoppel, as applied to the revocation of an offer to dedicate, is predicated upon the fact that it would be a fraud upon the public if the owner were permitted to revoke. In no view of the facts do I think this situation exists in this case; but apart from this, I think the old rule as to implied acceptance has also been changed. In other words, there must not only be a use by the public generally, but the street must be used by the public as a *highway,* and there must likewise be present, as in the

case of title by prescription, action by the public authorities in maintaining and repairing it as a highway.

In *Smith* v. *Smythe* (197 N. Y. 457, revg. 132 App. Div. 71) a private corporation owned a real estate development known as Lawrence park. The company filed a map showing the streets, which were fourteen feet in width. The owner of the plot made conveyances to various grantees, and all of the conveyances contained a reservation of a public right of way over the streets as *public highways*. Section 144 of the former Village Law of 1897 (now section 144 of the Village Law of 1909, as amd. by Laws of 1916, chap. 10) and section 80 of the former Highway Law of 1890, as amended by chapter 204 of the Laws of 1897 and subsequent statutes (now section 191 of the Highway Law of 1909, as amd. by Laws of 1922, chap. 266) specifically provided that the dedication of streets could not be accepted unless they were at least thirty-three feet wide. In that case a taxpayer sued to restrain the street commissioner of the village from spending public moneys upon the so-called streets. Chief Judge CULLEN, writing for the Court of Appeals, said: " It is the settled law of this State that a dedication must be accepted by the public authorities or by user to create a highway and vest in the public a right of passage thereon. In the case before us there was not and could not be any formal acceptance. Therefore, we are remitted to the inquiry whether there has been such a user as is sufficient or effectual for the purpose. That the public have been permitted to travel over the park streets for a few years is unquestioned; but that alone is not such a user as is requisite to constitute a highway. Mere travel by the public upon the roads, without action by the public authorities in repairing or maintaining them, is insufficient."

In *Matter of Wallace Avenue* (222 N. Y. 139) the same doctrine was approved. In that proceeding the petitioner was the owner of certain lots fronting on Graham street in the borough of The Bronx. The petitioner alleged that Graham street was closed by the filing of a map under the Street Closing Act (Laws of 1895, chap. 1006),* and she asked that commissioners of estimate and appraisal be appointed to ascertain and determine the compensation she should receive for the closing of the street. The first question that presented itself was whether Graham street was a public highway. It was shown that in April, 1893, the owner of a strip of land in which Graham street was situated, filed in the office of the county register a subdivision map showing the tract laid out in streets with lots fronting thereon. Graham

---

* Since amd. by Laws of 1923, chap. 752.— [REP.

street is shown on the map as a *cul-de-sac* running northerly from Morris Park avenue to the north boundary of the subdivision, a distance of about 350 feet. In March, 1895, a petition was presented to the authorities of the town of Westchester, wherein the tract subdivided lay, asking to have the streets and avenues shown on the map accepted by the town. So far as the record in the case shows, the petition was not granted. Clearly, however, there was an express offer to dedicate Graham street as a public highway. Later, on June 6, 1895, the town of Westchester, including Graham street, was annexed to the city of New York. It appears that after annexation Graham street was policed by officers of the city of New York, and in 1905 the Bronx Gas and Electric Company, which had a general grant to use the streets for its corporate purposes, laid down and maintained a gas main in Graham street, and the various property owners made connections with the main. In 1906 a private sewer was laid in part of the street. One of the predecessors in title of the petitioner applied to the president of the borough of The Bronx for leave to construct the sewer, and the application was granted on condition that the work should be done subject to the requirements of the department of sewers of the borough and under the supervision of an inspector of the department. The sewer was laid accordingly. In 1909 the commissioner of water supply, gas and electricity for the borough of The Bronx installed and maintained a street lamp in Graham street. In 1910 the president of the borough laid an ash sidewalk four feet wide along both sides of Graham street from Morris Park avenue to a point 230 feet north of the avenue. In 1913 a patrolman of the police force of the city prevented an agent of the petitioner from driving over the sidewalk on Graham street because such act was an unlawful use of that part of the public highway. It was further shown by the petitioner that during the ten years then last past pedestrians and people in vehicles had used Graham street as a thoroughfare to and from the houses fronting thereon, and to and from Mathews avenue, a nearby street. The roadway in Graham street had been for the same period in a fit condition for travel by horses, automobiles and other conveyances. The court, after citing and approving *Smith* v. *Smythe (supra)*, *Speir* v. *Town of New Utrecht (supra)*, and *People* v. *Underhill* (144 N. Y. 316), held that Graham street was not a public highway but was a private way, and the decision of the Appellate Division, holding that Graham street was not a public street, was affirmed.

These cases, it seems to me, conclude the defendants from claiming that Creek street and River avenue are public highways by reason of an acceptance of an alleged dedication, by reason of a

user, because, concededly, the city has never repaired or kept up either of these so-called streets.

An attempt was also made by the city to show acceptance of a proposed dedication by alleged formal action; that is, by the filing of the so-called city maps. The first city map was filed on October 5, 1907; the second city map, on May 10, 1910; and the third city map, which is intended to supersede both of the foregoing city maps, is now before the board of estimate and apportionment for adoption. The great trouble with these maps is that none of them is final, although they are designated as such in the provisions of the Greater New York charter, sections 439–442. They rather appear to the aspirations of the topographical bureau of the city and in the nature of a proposed street plan for ultimate adoption. The last city map, so called, shows a continuation of Creek street to the west of Washington avenue and to the east of the property of the plaintiff, although it is conceded that no streets ever did exist or now exist there. The city maps also differ from the Schieffelin maps in that Clay avenue is wider on the city maps, the boundaries of Montgomery avenue are different, a portion of Creek street is only fifty feet in width, and a gore north and south of the railroad at River avenue is shown on two of the city maps, indicating that private property is located on Creek street between River avenue and Clinton avenue, just north of the railroad. Section 439 of the Greater New York charter (Laws of 1901, chap. 466, as amd. by Laws of 1917, chap. 632) provides that section maps when adopted and filed " shall become a part of the map or plan of the city of New York, and shall be deemed to be final and conclusive with respect to the location, width and grades of the streets shown thereon, and the same shall not be subject to any further change or modification except as provided in section four hundred and forty-two of this act." Section 442 (as amd. by Laws of 1917, chap. 632) provides: " The board of estimate and apportionment is authorized and empowered, whenever and as often as it may deem it for the public interest so to do, to change the map or plan of the city of New York, so as to lay out new streets  *  *  *  and to change the grade of existing streets shown upon such map or plan." The section then prescribes the procedure whereby such change may be made and provides that if the action of the board shall receive the approval of the mayor the change shall be deemed to have been made. Prior to May 6, 1903, the approval of the resolution of the board of estimate and apportionment by an ordinance of the board of aldermen approved by the mayor was also required. (See said § 442, as amd. by Laws of 1903, chap. 409; Laws of 1913, chap. 329, and Laws of 1917, chap. 632.)

In *Matter of City of New York (Saratoga Ave.)* (226 N. Y. 128), under a similar statute (Laws of 1869, chap. 670, as amd.), the Court of Appeals held that the action of the authorities amounted to no more than the adoption of a plan for possible future streets. In *Matter of City of New York (Roosevelt Ave.) (supra)* this court rendered a similar decision. In that case it appeared that a terminal company had filed with the county clerk, in 1909, a map of its property on which Roosevelt avenue was delineated. In June, 1911, the board of estimate approved Queens borough final map 10, which, on February 16, 1912, was officially filed with the borough president. It corresponded with the map filed by the appellant in 1909 so far as concerned the Roosevelt avenue street lines and the abutting blocks referred to in those proceedings. The question as to whether or not the filing of the final section maps by the city of New York constituted an acceptance of the dedication was discussed by both counsel in their briefs. It also appeared that the company, in addition to filing the map, sold lots on Roosevelt avenue by reference to the map. This court held that this did not constitute an acceptance of an offer to dedicate, saying, by Putnam, J.: " It cannot be said that there had been any acceptance of Roosevelt avenue by the city." To the same effect see *City of Buffalo* v. *D., L. & W. R. R. Co.* (68 App. Div. 488; affd., without opinion, 178 N. Y. 561), and *People* v. *Underhill (supra)*.

It seems to me that before the city can get to the question of formal acceptance of an offer to dedicate, by the filing of maps, it is met with a further and insuperable obstacle. As above pointed out, the first city map was filed in 1907. Before that time, if we concede that there was a valid offer to dedicate either Creek street or River avenue, it was completely revoked before acceptance thereof. There can be no question that an offer to dedicate may be revoked or withdrawn at any time before acceptance, either actual or implied. In *Stillman* v. *City of Olean* (228 N. Y. 322, 328) the court expressly so held, and stated as follows: " The basis of all claims of a public highway or of private easements is the Gosseline map. We are assuming that this map operated as an offer to dedicate certain strips of land to street purposes. The same indisputable principles are applicable to that as to any other voluntary offer. At any time before it was accepted or acted upon or rights had accrued thereunder it could be withdrawn and annulled." To the same effect see *Mark* v. *Village of West Troy* (76 Hun, 162; affd., 151 N. Y. 453). Likewise, the death of the owner who has made the offer to dedicate operates as a refutation, and Mr. Schieffelin died in 1900. His

death, therefore, tended to revoke the unaccepted offer to dedicate. (See *People* v. *Kellogg,* 67 Hun, 546; *Matter of Fox Street,* 54 App. Div. 479, 485; 18 C. J. 122.)

It is not necessary to discuss other points raised by the appellant, such as the abandonment of a public highway, if it be conceded that Creek street or River avenue ever was a public highway.

. The judgment should be reversed on the law and the facts, with costs in this court and in the court below, and judgment directed for the plaintiff, enjoining the defendants from interfering with the plaintiff's property as prayed for in the complaint.

RICH and YOUNG, JJ., concur; KELLY, P. J., reads for affirmance, with whom KAPPER, J., concurs.

KELLY, P. J. (dissenting):

The intention of plaintiff's immediate grantor, Schieffelin, to dedicate the various streets shown upon his map to the public use seems to be manifest. His map was prepared in 1886, and the two streets, " Creek street " and " River avenue," were shown on this map. " River avenue " and part of Creek street were shown on the " Map of 1863," filed as far back as 1863. The streets are also laid out on the various city maps filed long before plaintiff's attempted appropriation and closing of these highways. These maps and the existence of the streets are recited in the deeds in plaintiff's title, and plaintiff and its grantors appear to have acquiesced in their use. It was not until 1919 when the plaintiff's operations were so greatly increased, and after they had availed themselves of the use of these streets which had been closed during the war by the Federal government, that any right to close the streets to the public was asserted. Plaintiff's contention, if upheld, will bar all access to Newtown creek, an important waterway, east of Washington avenue.

The trial justice has found as matter of fact, upon sufficient evidence, that Creek street between Washington avenue and the Van Alst line, about 100 feet east of Brook avenue, has been continuously used by the public for vehicular and pedestrian traffic and kept open as a highway for twenty years preceding the commencement of the action, and that River avenue between the Long Island railroad and Newtown creek has been so used and kept open during the same period. That Clifton avenue, next west of River avenue, has been used continuously for many years, with a railroad crossing protected by the usual crossing sign, is practically undisputed. If Creek street on the south of the railroad was not an open public street, I seriously doubt whether the railroad company would ever have maintained this crossing.

The United States government closed all of the streets between the railroad tracks and Newtown creek during the war; the plaintiff had the benefit of this closing, but apparently wishes to take advantage of the order of the War Department made in the great emergency, and keep the streets closed. They were closed for the benefit of the people of the United States, not for the benefit of the plaintiff.

I think the judgment was right and that it should be affirmed.

KAPPER, J., concurs.

Judgment reversed on the law and the facts, with costs in this court and in the court below, and judgment directed for the plaintiff, enjoining the defendants from interfering with the plaintiff's property as prayed for in the complaint. Settle order and findings on two days' notice.